Neil G. Sparber (NS-9165)
Samantha E. Beltre (SB-7834)
FULBRIGHT & JAWORSKI L.L.P.
666 Fifth Avenue
New York, New York 10103
Tel:    (212) 318-3000
nsparber@fulbright.com
sbeltre@fulbright.com

Attorneys for Defendant JPI Partners, LLC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
GLEN VETROMILE,                                          :

                            Plaintiff,               :       07 Civ. ____

                   -against-                             :       **NOTICE OF REMOVAL**

JPI PARTNERS, LLC,                                    :
                            Defendant.               :

-------------------------------------------------------------X

**'07 CIV 11032**

**JUDGE KARAS**

        Defendant JPI Partners, LLC ("JPI Partners") hereby removes this action from

the Supreme Court of the State of New York, County of Westchester (Index No. 23404/07) to the

United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1441.

The grounds for removal are as follows:

        1.   On or about November 13, 2007, Plaintiff Glen Vetromile ("Vetromile") filed a

summons and complaint in the Supreme Court of New York, County of Westchester, Index No.

23404/07.

        2.   The summons and complaint were served on JPI Partners by service on the

Secretary of State on November 16, 2007.

        3.   JPI Partners is filing this Notice of Removal within thirty days of the receipt of

the complaint.  Accordingly, this removal is timely pursuant to 28 U.S.C. § 1446(b).

4. The United States District Court for the Southern District of New York has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) on the basis that this suit involves a matter in controversy exceeding $75,000.00 and citizens of different states.

5. This Court has jurisdiction over this action under 28 U.S.C. §§ 1441 and 1332 because complete diversity exists between the parties.

6. JPI Partners is a Delaware limited liability corporation with its principal place of business in the state of Texas.

7. Vetromile is, as set forth in the complaint, a citizen and resident of New York, residing at 9 Ridge Road, Bronxville, New York, 10708.

8. The venue of this removal action is proper pursuant to 28 U.S.C. § 1441(a) because the United States District Court for the Southern District of New York embraces the Supreme Court of New York, County of Westchester, which is the court where the state court action is pending.

9. Pursuant to 28 U.S.C. § 1446 and Local Rule 81:

   a.    An index of all documents filed in the state court action is attached hereto as Exhibit 1;

   b.    A copy of the notice of service of process of the summons and complaint on JPI Partners in the state court action is attached hereto as Exhibit 2;

   c.    A copy of the summons served and filed in the state court action is attached hereto as Exhibit 3;

   d.    A copy of the complaint served and filed in the state court action is attached hereto as Exhibit 4;

e.    A true copy of this Notice of Removal will be served upon the Law Office of Greenfield Stein & Senior, LLP, counsel for plaintiff, at 600 Third Avenue, New York, New York 10016; and

f.    A true copy of this Notice of Removal will be filed with the Clerk of the Court for the Supreme Court of the State of New York, County of Westchester.

10.    JPI Partners will pay all costs and disbursements incurred by reason of the removal of the state court action should it be determined that the action was not removable or was improperly removed.

WHEREFORE, JPI Partners pray that this Court accept jurisdiction of this Action and henceforth that this Action be placed on the docket of this Court for further proceedings, the same as though this Action had been originally instituted in this Court.


Dated: New York, New York
       December 5, 2007


                              FULBRIGHT & JAWORSKI L.L.P.


                    By:    _Neil H. Sparber (SB)_____
                           Neil G. Sparber (NS-9165)
                           Samantha E. Beltre (SB-7834)
                           666 Fifth Avenue
                           New York, New York  10103
                           Tel:    (212) 318-3000
                           nsparber@fulbright.com
                           sbeltre@fulbright.com

                           Attorneys for Defendant JPI Partners, LLC

## **INDEX OF DOCUMENTS FILED IN THE STATE COURT ACTION**

Exhibit 2:     Notice of service of process of the summons and complaint on JPI

              Partners in the state court action.

Exhibit 3:     Summons, filed in the state court action on November 13, 2007.

Exhibit 4:     Complaint, and the exhibits attached thereto, filed in the state court action

              on November 13, 2007.



**RECEIVED**

NOV 2 6 2007

Risk Management

CORPORATION SERVICE COMPANY·

## Notice of Service of Process

SXY / ALL
Transmittal Number: 5455036
Date Processed: 11/21/2007

Primary Contact:      Ms. Vanessa Hoffman
                      JPI Companies
                      600 E. Las Colinas Blvd.
                      Suite 1800
                      Irving, TX 75039

Copy of transmittal only provided to:    Diana Gonzalez

| | |
|---|---|
| Entity: | JPI Partners LLC<br>Entity ID Number  1960885 |
| Entity Served: | JPI Partners LLC |
| Title of Action: | Glen Vetromile vs. JPI Partners, LLC |
| Document(s) Type: | Summons/Complaint |
| Nature of Action: | Wrongful Termination |
| Court: | Westchester Supreme Court, New York |
| Case Number: | 23404/07 |
| Jurisdiction Served: | New York |
| Date Served on CSC: | 11/21/2007 |
| Answer or Appearance Due: | 20 Days |
| Originally Served On: | NY Department of State no 11/16/2007 |
| How Served: | Certified Mail |
| Plaintiff's Attorney: | Paul T. Shoemaker<br>212-818-9600 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not
constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**
*CSC is SAS70 Type II certified for its Litigation Management System.*
2711 Centerville Road   Wilmington, DE 19808   (888) 690-2882  |  sop@cscinfo.com

RECEIVED

NOV 26 2007

Risk Management

State of New York, Department of State
Division of Corporations

Plaintiff/Petitioner:
VETROMILE, GLEN

Party Served:
JPI PARTNERS LLC

CORPORATION SERVICE COMPANY
80 STATE STREET 6TH FL
ALBANY, NY 12207

Dear Sir/Madam:
Enclosed herewith is a legal document which was served upon the Secretary of
State on 11/16/2007 pursuant to SECTION 303 OF THE LIMITED LIABILITY COMPANY
LAW. This copy is being transmitted pursuant to such statute to the address
provided for such purpose.

Very truly yours,
Division of Corporations

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

Index No. 23404/07

------------------------------------------------------------X

GLEN VETROMILE,

Plaintiff,

-against-

JPI PARTNERS, LLC,

Defendant.

------------------------------------------------------------X

Plaintiff designates
Westchester County as the
place of trial

The basis of the venue is
Plaintiff's residence

**SUMMONS**
Plaintiff resides at
9 Ridge Road
Bronxville, NY 10708

County of Westchester

To the above-named Defendant:

*You are hereby summoned* to answer the complaint in this action and to serve a
copy of your answer to such complaint on the plaintiff within 20 days after the service of this
summons, exclusive of the day of service (or within 30 days after the service is complete if this
summons is not personally delivered to you within the State of New York); and in case of your
failure to answer, judgment will be taken against you by default for the relief demanded in the
complaint.

Dated: New York, New York
    November 5, 2007

GREENFIELD STEIN & SENIOR, LLP

By: _Paul T. Shoemaker_
    Paul T. Shoemaker
    (A Member of the Firm)
    Attorneys for Plaintiff
    600 Third Avenue
    New York, NY 10016
    (212) 818-9600

Defendant's address:

    One North Broadway
    Suite 807
    White Plains, NY 10601

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER
------------------------------------------------------------ X
GLEN VETROMILE,                                          Index No. 23404/07

                                    Plaintiff,           :    COMPLAINT

                         -against-                       :

JPI PARTNERS, LLC,                                       :

                                    Defendant.           :
------------------------------------------------------------ X

        Glen Vetromile ("Vetromile"), by and through his attorneys, Greenfield Stein &
Senior, LLP, for his complaint against defendant JPI Partners, LLC ("JPI"), alleges as follows:

        1.     Vetromile is a citizen of the State of New York, residing in Bronxville,
New York.

        2.     Upon information and belief, defendant JPI is a limited liability company
organized and existing under the laws of one of the states of the United States and has a place
of business at One North Broadway, White Plains, New York.

        3.     Vetromile has had a long and successful career in real estate
development.

        4.     During 2006, defendant JPI recruited Vetromile to join JPI as Senior Area
Vice President and Managing Partner in JPI's office in White Plains for all of JPI's
development activities in the tri-state area.

5.    JPI presented Vetromile with an offer letter (copy annexed hereto as Exhibit A) which set forth the terms of his employment.

6.    Those terms included, among other things, an annual salary of $270,000 and provision for an annual bonus in the amount of $100,000 for each of his first two years of employment, together with additional payments of $50,000 for each executed deal put through due diligence and $100,000 for each deal with a purchase of land.

7.    The employment letter also provided for Vetromile to participate in JPI's Profit Participation Plan and in JPI's Employee Benefit Programs.

8.    On or about June 16, 2006, Vetromile and JPI entered into an agreement called the Area Development Partners Profit Participation Plan, a copy of which is annexed hereto as Exhibit B.

9.    Vetromile commenced employment with JPI on or about June 19, 2006 pursuant to the above-described arrangements.

10.    Vetromile at all times performed his duties for JPI fully, diligently and successfully.

11.    Among other things, he brought to JPI its first successful transaction in the New York area in several years, the Maritime Yards project in Norwalk, Connecticut.

12.    Pursuant to the terms of the employment letter and the Profit Participation Plan, Vetromile was entitled to payments in the total amount of $150,000 in connection with the Maritime Yards project.

13.    In addition, Vetromile is entitled to payment of a bonus in the amount of $100,000 for his first year of employment.

14.    Notwithstanding Vetromile's diligent and successful performance of his duties, JPI abruptly and without cause terminated Vetromile's employment on or about November of 2006.

15.    Inasmuch as the termination was without cause and was stated to be solely due to "cultural differences", Vetromile is entitled to full payment of all of the monies and benefits which JPI had agreed to provide to him, including without limitation the above described bonus, payments in connection with the Maritime Yards transaction, and Profit Participation payments.

16.    Upon information and belief, the Profit Participation payments to which Vetromile is entitled have a value in excess of $1,050,000.

17.    In addition, pursuant to JPI's established policies and practices concerning the payment of severance, Vetromile is entitled to severance pay which has not been paid to him.

18.    JPI has expressly refused and failed to make any of the above described payments to him notwithstanding Vetromile's demands therefor.

- 3 -

**FIRST CAUSE OF ACTION**
**(BREACH OF CONTRACT)**

19.     Plaintiff repeats and realleges paragraphs 1 through 18 as if fully set forth

20.     JPI has breached its contractual commitments to Vetromile as described above by failing to make the payments to which he is entitled in connection with the Maritime Yards project, his bonus in the amount of $100,000, the value of his interest in JPI's Profit Participation Plan, and the severance pay and benefits to which he is entitled.

**SECOND CAUSE OF ACTION**
**(UNJUST ENRICHMENT)**

21.     Plaintiff repeats and realleges paragraphs 1 through 20 as if fully set forth

22.     JPI has been unjustly enriched by having been permitted to obtain the value of Vetromile's services without paying him the full and fair value thereof.

**THIRD CAUSE OF ACTION**
**(QUANTUM MERUIT)**

23.     Plaintiff repeats and realleges paragraphs 1 through 22 as if fully set forth.

24.     JPI accepted Vetromile's services with the understanding and expectation that it would pay Vetromile the fair and reasonable value of the services and Vetromile rendered his services with the same understanding.

- 4 -

25.    JPI has failed and refused to pay to Vetromile the fair and reasonable value of his services.    Accordingly, Vetromile has a claim against JPI based on <u>quantum meruit</u>.

**WHEREFORE**, Vetromile demands that judgment be entered in his favor and against JPI, awarding Vetromile damages in the amount of not less than $1,300,000, together with prejudgment interest, all legal fees incurred by Vetromile, and such other and further relief as the Court may deem just and proper.

Dated:    New York, New York
           November 1, 2007

**GREENFIELD STEIN & SENIOR, LLP**

By: *Paul T. Shoemaker*
        Paul T. Shoemaker
*Attorneys for Plaintiff*
600 Third Avenue - 11th Floor
New York, New York 10016
(212) 818-9600

Exhibit
A

Exhibit A

*Offer Letter from JPI*



May 24, 2006                                              *"CONFIDENTIAL"*

Glen Ventromile
9 Ridge Road
Bronxville, NY 10708

Dear Glen:

In regard to our recent discussions concerning your potential employment with JPI Partners, LLC (JPI), I am formalizing and extending a conditional offer of employment to you, which is outlined below.

## Position Title

Senior Area Vice President and Managing Partner

## Office Location

New York Area Office

## Start Date

June 19, 2006

## Base Salary

You will receive an annual salary of $270,000.00, which is equivalent to a semi-monthly salary of $11,250.00 pro-rated for the first pay period if appropriate. All stated compensation amounts described herein will have the applicable taxes withheld and any deduction for participation in any of JPI's Employee Benefit Programs (i.e., life, health, dental, disability insurance, 401(k) profit sharing/retirement, etc.).

## Profit Participation Plan

You will be eligible to participate in our Profit Participation Plan (The "Plan") enclosed. Prior to your start date, these documents should be reviewed and returned fully executed. You may contact Marie C. Shelton, Assistant Vice President of Profit Participation and Business Solutions. She will answer questions and walk through examples of the calculations discussed in the Plan. Upon execution, this Offer Letter and the Plan should be returned in the envelope provided.

Glen Ventromile                                          *"CONFIDENTIAL"*
May 24, 2006
Page 2 of 3

Signing Bonus

Additionally, you will be paid a bonus of $10,000.00, which will be paid after you reach 90 days
of employment.

Bonus Specifics

JPI will guarantee a $100,0000.00 bonus for first two years of employment, in additional to the
following for the first three years only:
      $50,000.00 per each executed deal put through due diligence
      $100.000.00 per each deal with a purchase of land

These payments are not credited toward the PPP.

After 36 months of employment, PPP only is in effect.

Club Dues

JPI will pay your country club dues up to $500.00 per month.

Auto Allowance

Since you may be required to travel on company business from time to time, you will be
provided with a $1000.00 per month auto allowance.  This will be included in your semi-
monthly paycheck.  Please keep personal records since they are required by the IRS if you desire
to deduct business expenses.

Associate Benefit Program

You are eligible to enroll for coverage in JPI's benefits if you are a full-time, regular associate
and have completed 60 days of employment.  Your coverage will become effective on the 60th
day of employment as long as enrollment paperwork has been submitted to the Human
Resources/Benefits department prior to the 60th day of employment.  If paperwork is not received
by the Human Resources/Benefits department by the 90th day of employment, you will not be
eligible for benefits until the following open enrollment period which is typically in November.
Upon your employment, you will receive the benefits package from the Human Resource
Services department.

There are two items described below that are considered conditions of this offer of employment.
They are: (1) successful completion of a drug test within four days of receipt of this letter and
successful completion of the background screening program which includes all requested
references and the PDI assessment.  On your first date of employment, you must submit to your
manager two appropriate forms of identification along with the enclosed I-9 form.  This ensures
that your first JPI payroll check will be processed in a timely manner.

This letter is not intended to be an employment contract.  Furthermore, as an associate of JPI,
your relationship and association with JPI will be on the basis of employment at will.  This letter
is simply a summary description of our job offer to you, and JPI reserves the right to modify,
change, revise, or discontinue, any terms and conditions, at the sole discretion of the company.

Glen Ventromile
May 24, 2006
Page 3 of 3

"CONFIDENTIAL"

In addition, all stated compensation amounts described above will have the applicable taxes withheld.

I am excited about your future at JPI. Your personal commitment to excellence is obvious from your track record, and I am confident that your leadership will bring many benefits to the organization.

Sincerely,


_____

JIM BUTZ
JPI Partners, LLC
President and Managing Partner, Eastern Division


_____

Ronald D. Ingram
JPI Partners, LLC
Chief Operating Officer


_____

J. Frank Miller, III
JPI Partners, LLC
CEO and Chairman of the Board


IN ACCEPTING THIS OFFER, YOU ACKNOWLEDGE THAT NO REPRESENTATION CONCERNING THE AMOUNT OF YOUR COMPENSATION WITH JPI (INCLUDING BUT NOT LIMITED TO BONUSES, INCENTIVES, PROFIT PARTICIPATION AND/OR EQUITY INTERESTS) HAVE BEEN MADE TO YOU, EXCEPT AS SHOWN IN THIS LETTER AND THE ENCLOSED PROFIT PARTICIPATION PLAN; AND THAT THIS OFFER LETTER AND THE PLAN ARE THE ONLY REPRESENTATIONS ON WHICH YOU HAVE RELIED IN ACCEPTING THIS OFFER.


_____
Glen Ventromile
                                                            Date


cc: Marie C. Shelton

Exhibit
B

> • THIS PLAN AND THE ATTACHMENTS HERETO SUPERCEDE ALL PRIOR WRITTEN OR VERBAL COMMUNICATIONS REGARDING THE PARTICIPANT'S PROFIT PARTICIPATION RIGHTS AND CONSTITUTE THE ENTIRE AGREEMENT REGARDING THE PARTICIPANT'S PROFIT PARTICIPATION RIGHTS.
>
> • PRIOR OR FUTURE VERBAL OR WRITTEN STATEMENTS, COMMENTS OR COMMITMENTS REGARDING THE PARTICIPANT'S PROFIT PARTICIPATION RIGHTS ARE NOT BINDING ON THE COMPANY, AND SHOULD NOT BE RELIED UPON BY THE PARTICIPANT.
>
> • THIS PLAN MAY ONLY BE AMENDED IN WRITING BY THE CEO OF THE COMPANY. ANY WRITTEN CALCULATIONS OR ESTIMATES CREATED OR PROVIDED TO YOU IN CONNECTION WITH THIS PLAN SHALL <u>NOT</u> BE CONSIDERED AMENDMENTS TO THIS PLAN, AND THE TERMS OF THIS PLAN SHALL CONTROL OVER ANY DISCREPANCIES IN SUCH CALCULATIONS OR ESTIMATES.

**AREA DEVELOPMENT PARTNERS**
**PROFIT PARTICIPATION PLAN**

Glen Ventromile
9 Ridge Road
Bronxville, NY 10708

Dear Glen:

      The purpose of this Agreement is to set forth the terms of the **Area Development Partners Profit Participation Plan (the "Plan")** established for you by JPI Partners, LLC (the "Company"). Your incentive compensation under the Plan will be based (i) in part on the Adjusted Cash Flow (as defined in Exhibit A) from your designated Service Company operations of the Company and the JPI Group ("JPI Service Company Operations") directly attributable to your Designated Geographic Area (as defined below) and (ii) in part on the Adjusted Project Cash Flow (as defined below) from real estate projects in which you are a participant during your employment with the Company or any of the JPI Group. As of the effective date of this Agreement, your "Designated Geographic Area" and your designated JPI Service Company Operations are the geographic area and operations of the JPI Group listed on Exhibit D. Your Designated Geographic Area and designated JPI Service Company Operations are subject to change from time to time by the Company. For purposes of this Plan, the "JPI Group" means JPI Multifamily Investments, L.P., a Delaware limited partnership ("JPI") and any entity in which JPI directly or indirectly owns an aggregate of 15% or more of the equity interests in such entity. For purposes of this Plan, an "Affiliate" of the Company is any entity in which JPI, directly or indirectly owns an aggregate of 15% or more of the equity interests in such entity.

      The terms of the Plan are as follows:

      1.    Service Company Participation Amount. For each semiannual period or portion thereof during which you are employed by the Company or any of the JPI Group, and subject to the terms of this Plan, the Company shall accrue to you an amount (the "Service Company Participation Amount") equal to your "Service Company Participation Percentage" for such semiannual period times the Adjusted Cash Flow of the Company and the JPI Group from your designated JPI Service Company Operations in your Designated Geographic Area for such semiannual period or portion thereof.

**Your Service Company Participation Percentage is two percent (2.00%)
effective January 1, 2008.** With respect to future periods the Company reserves the right, in its
sole discretion, to change the terms of the Service Company Participation Amount component of
this Plan, including, but not limited to, the right to change the base to which such component
applies (by amending Exhibit D or substituting a new version therefore) and the right to change
your Service Company Participation Percentage.

2.    Real Estate Participation Amounts.

A.    Designation of Projects.  Exhibit B sets forth each project, including any
land, which has been acquired or on which construction has commenced ("Commenced Project")
as of the date hereof, with respect to which you have a Real Estate Participation Amount (as
defined below), and your "Real Estate Participation Percentage" with respect to each such
project.  Future projects, if any, with respect to which you may or you will have a Real Estate
Participation Amount, along with your Real Estate Participation Percentage for such projects,
will be added to an amended Exhibit B in the Company's sole discretion.  You will have no
interest in any future project until such project is added to an amended Exhibit B to this
agreement.  All references in this document to Exhibit B shall mean Exhibit B as amended from
time to time.  All current projects listed on Exhibit B and the future projects, if any, to be added
to Exhibit B are collectively referred to in this Agreement as "Projects."

**Your Real Estate Participation Percentage for each Project shall be two
percent (2.00%) unless otherwise set forth in an amended Exhibit B delivered to you,
provided that with respect to any Project listed on Exhibit B as a JPIIC or JPIMI Project
for which there is a third-party adjustment under clause (iv) of Exhibit C, your Real Estate
Participation Percentage for such Project shall be doubled, or four percent (4.00%), unless
otherwise set forth in an amended Exhibit B.**  At no time will a Project be deleted from
Exhibit B or your Real Estate Participation Percentage shown therein for a Project be changed,
unless, in the case of a Commenced Project, your Real Estate Participation Amount with respect
to such Project has been purchased pursuant to Paragraph 4 or 5 below, or, a Termination Date
(as defined in Paragraph 4 below) occurs.

B.    Calculation of Real Estate Participation Amounts.  For purposes of this
Agreement, your "Real Estate Participation Amount" for a Commenced Project shall mean an
amount equal to your Real Estate Participation Percentage for such Commenced Project times
the Adjusted Project Cash Flow for such Commenced Project.  The method of determination of
Adjusted Project Cash Flow is set forth on Exhibit C (the "Adjusted Project Cash Flow").

For each Commenced Project which is sold or refinanced, an estimate of your
Real Estate Participation Amount for such Commenced Project for the semi-annual period in
which such Project is sold or refinanced will be calculated in accordance with the principles of
Exhibit C and accrued to your account on the date of sale and be paid or applied within 45
calendar days after the closing of the sale or refinancing.  Within such 45-day period, at least
90% of the estimated Real Estate Participation Amount for such Commenced Project will be paid
to you ("Estimated Real Estate Payment").  At the end of each semiannual period, a comparison
of the actual and estimated Real Estate Participation Amounts shall be made, and your account
for such Commenced Project shall be adjusted accordingly.  Except as otherwise provided in

Paragraph 15 hereof, to the extent that an amount finally determined to be payable under this Paragraph 2B. exceeds any Estimated Real Estate Payment made with respect thereto, such excess shall bear interest at an annual rate of 9.5% compounded monthly, with such interest accruing from the date of payment of the Estimated Real Estate Payment to the date of payment of such difference to you. To the extent that an Estimated Real Estate Payment exceeds the amount with respect thereto finally determined to be payable under this Paragraph 2B., such excess payment shall bear interest at an annual rate of 9.5% compounded monthly and such excess payment and the accrued interest thereon will be netted against your current and future participation amounts under the Plan.

To the extent the Adjusted Project Cash Flow for a Commenced Project is negative, this calculation will produce a negative Real Estate Participation Amount that will be netted against your current and future participation amounts under the Plan pursuant to Paragraph 3 below.

3.    Calculation and Payment of Net Participation Amount. Within 45 days after the end of each semiannual period, the Company will aggregate your Service Company Participation Amount, if any, for such semiannual period as calculated in Paragraph 1 above and all of your Real Estate Participation Amounts, if any, for such semiannual period as calculated in Paragraph 2 above to arrive at a net participation amount for you for such semiannual period (the "Net Participation Amount").

Subject to the recovery of any cumulative-to-date negative Net Participation Amount and any excess payment and accrued interest thereon described in Paragraph 2B. above, if your Net Participation Amount for a semiannual period is a positive amount, the Company will promptly pay to you in cash your Net Participation Amount, reduced by the sum of (x) any semiannual payments made to you against your Net Participation Amount for such semiannual period pursuant to this Plan, and (y) all Estimated Real Estate Payments made to you for such semiannual period pursuant to Paragraph 2B. above. To the extent that the Net Participation Amount is a negative amount in any semiannual period, the negative amount will carry forward and reduce your Net Participation Amount in each succeeding subsequent semiannual period, until the sum of the negative amount and interest thereon, accrued at an annual rate of 9.5% compounded monthly, is reduced to zero.

Any semiannual payment shall be made within 45 days of the end of the semiannual period and shall be an amount equal to your estimated Net Participation Amount under this Plan for such semiannual period less the sum of all Estimated Real Estate Payments made to you for such semiannual period pursuant to Paragraph 2B. above. In no event shall you be required to repay to the Company any semiannual payments made to you pursuant to this Paragraph 3 except by way of offset against future payments otherwise payable to you under this Plan.

4.    Purchase of Commenced Projects Real Estate Participation Amounts. For purposes of this Plan, a "Termination Date" shall be deemed to occur on the earlier of the first day (x) that you are no longer employed by the Company or any member of the JPI Group for any reason, including, without limitation, death or disability, or (y) on which there has been a change in your employee status (i.e., your status is other than that of an Area Partner, including,

but not limited to, change of status to another type of Partner within the JPI Group) or (z) on which there is any material change in your duties for the Company or its Affiliates, as determined by the Company, including, but not limited to, a change in the geographic area or operations of the JPI Group in which you have responsibilities. After a Termination Date, your Real Estate Participation Amounts with respect to each Commenced Project listed on Exhibit B on the Termination Date (but not your Service Company Participation Amount) will continue to accrue and be paid to you in accordance with the terms of this Plan, except to the extent part or all of your Real Estate Participation Amounts with respect to Commenced Projects are purchased from you pursuant to this Paragraph 4 or Paragraph 5 below. In no event shall you have any interest in any projects that are not included on Exhibit B on the Termination Date.

Any time prior to a Termination Date, and at any time within six months after a Termination Date, the Company shall have the right to notify you in writing (the "Buy-Out Notice") that it or its designee (either of which is referred to herein as the "Purchaser") will purchase from you for cash your interest in any future Real Estate Participation Amounts related to all or a specified portion of the Commenced Projects for the Buy-Out Price (as defined below), in which case you will sell to the Purchaser, and the Purchaser will purchase from you, the Real Estate Participation Amounts designated in the Buy-Out Notice. The date of the Buy-Out Notice is referred to herein as the "Notice Date". In the Buy-Out Notice the Company may elect to purchase your Real Estate Participation Amounts with respect to only a portion of the Commenced Projects.

Whether or not your interest in future Real Estate Participation Amounts with respect to a Commenced Project is purchased or retained, upon the occurrence of a Termination Date your Real Estate Participation Percentage set forth in Exhibit B for each Commenced Project as of the Termination Date shall be reduced in accordance with the following table:

| Status of Commenced Project | Amount of Reduction |
|---|---|
| **If construction on the Commenced Project has not commenced** | **No reduction in Real Estate Participation Percentage (but the Real Estate Participation Percentage will apply only to the increase or decrease in the land value of the Commenced Project from the date of its acquisition through the Termination Date (as determined by the Company)** |
| **If construction on the Commenced Project has commenced, but the Commenced Project has not been issued a final certificate of occupancy** | **Reduce Real Estate Participation Percentage by 50%** |
| **If a final certificate of occupancy has been issued for the Commenced Project** | **Reduce Real Estate Participation Percentage by 25%** |

**If the Commenced Project has been sold**        **No reduction in Real Estate Participation Percentage**

If a Commenced Project on a Termination Date (or earlier date specified in the following paragraph for a Commenced Project which the Company elects to purchase from you before a Termination Date) is a Project which constituted improved property when it initially was acquired by the Company or one of its Affiliates, your Real Estate Participation Percentage in such Commenced Project shall be reduced by (i) 50% where the rehabilitation of such Project, as provided in the initial underwriting for such Project, has not been completed by such date, or (ii) 25% where such rehabilitation has been completed by such date.

If the Company exercises its right to purchase your interest in a future Real Estate Participation Amount with respect to a Commenced Project before a Termination Date has occurred, your Real Estate Participation Percentage shall be reduced as set forth above, but effective as of the date on which the Company pays you for the purchase of such future Real Estate Participation Amount rather than as of the Termination Date (with the date of the Company's notice to you of its election to purchase the Real Estate Participation Amount being substituted for the Termination Date in the Amount of Reduction column in the first reduction paragraph set forth above (i.e., construction not yet commenced). In no event shall such payment date occur more than 90 days after the Notice Date.

The Buy-Out Price for each purchased Real Estate Participation Amount with respect to a Commenced Project shall be paid within 30 days after the determination of such Buy-Out Price (which determination shall occur no later than 90 days after the Notice Date), and will be calculated as the Real Estate Participation Amount which would have been payable to you if on the Notice Date the Commenced Project to which the Real Estate Participation Amount relates had been sold for fair market value.

The Company shall propose to you in the Buy-Out Notice a fair market value as of the Notice Date for each Commenced Project with respect to which the Real Estate Participation Amount is to be purchased. In determining fair market value, Commenced Projects shall be valued in their existing condition, except that if a Commenced Project has not been completed or stabilized, the Commenced Project shall be valued as if it were a completed and stabilized Commenced Project and net present valued. If you do not notify the Company in writing within 15 days after the Notice Date that you disagree with the fair market value of a Commenced Project as set forth in the Buy-Out Notice, the fair market value set forth in the Buy-Out Notice shall be final. If you notify the Company in writing within such 15-day period that you disagree with the fair market value set forth in the Buy-Out Notice for one or more Commenced Projects, you shall also name in such notice a qualified real estate appraiser who, at your expense, shall prepare an appraised fair market value of the Commenced Project or Commenced Projects under the guidelines set forth in the second preceding sentence. The Company shall also appoint a qualified real estate appraiser who, at the Company's expense, shall prepare an appraised fair market value of the Commenced Project or Commenced Projects under such guidelines. If the lower of the two appraised fair market values for a Commenced Project is at least 90% of the higher of such values, the two values shall be added together and divided by two, and the result shall be the final fair market value of that Commenced Project. If

the lower of the two appraised fair market values for a Commenced Project is less than 90% of the higher of such values, the two appraisers shall select a third qualified real estate appraiser who shall designate one of the two previously prepared appraised fair market values as being the closest to the third appraiser's judgment of the fair market value of that Commenced Project, and such previously appraised fair market value so designated by the third appraiser shall be the final fair market value of that Commenced Project.

The making of the payments pursuant to this Paragraph 4 with respect to a purchased Real Estate Participation Amount shall automatically release the Company from all obligations to you with respect to such Real Estate Participation Amount and the Commenced Project related thereto (but shall not affect your rights to any Service Company Participation Amount, unless such right is otherwise terminated pursuant to this Plan, or any other Real Estate Participation Amounts to which you are entitled under this Plan), and no release of these obligations needs to be signed by you.

In the event it is determined pursuant to the procedures set forth above that a Commenced Project which is the subject of a Buy-Out Notice has no market value (i.e., the Commenced Project has a negative fair market value), (i) you shall not be obligated to pay any monies to the Company as a result of such lack of market value, (ii) your negative Real Estate Participation Amount with respect to such Project (i.e., your Real Estate Participation Percentage for such Project times the negative fair value of the Project) shall be netted against and shall reduce any and all other payments owing to you under this Plan, and (iii) your Real Estate Participation Amount with respect to such Commenced Project shall terminate without further action by you or the Company.

5.    Additional Purchase Rights.  In addition to the purchase provisions set forth above, if the Company enters into a transaction that results in the transfer of all or a portion of the Commenced Projects for non-cash consideration (including, but not limited to, stock in a real estate investment trust), the Company or its designee may, at its election, purchase for cash or for such non-cash consideration (with a fair market value equal to the cash that would have been paid if the cash election had been made) your interest in future Real Estate Participation Amounts with respect to such transferred Commenced Projects.  The purchase price to be paid by the Company to you for each such Real Estate Participation Amount shall be an amount equal to the value (whether negative or positive) ascribed in such earlier transfer by the Company to the Commenced Project to which such Real Estate Participation Amount relates times your Real Estate Participation Percentage in such Commenced Project (with all positive and negative amounts being netted, and any net negative amount being applied to reduce other payments owing to you under this Plan).  The making of the payments pursuant to this Paragraph 5 with respect to a purchased Real Estate Participation Amount shall automatically release the Company from all obligations to you with respect to such Real Estate Participation Amount and the Commenced Project related thereto (but shall not affect your rights to any Service Company Participation Amount, unless such right is otherwise terminated pursuant to this Plan, or any other Real Estate Participation Amounts to which you are entitled under this Plan), and no release of these obligations needs to be signed by you.

6.    No Right to Be Retained.  Nothing contained in this Agreement shall give you any right to be retained in the services of the Company or any of its Affiliates or to interfere with

or restrict the right of the Company or any of its Affiliates, which is hereby expressly reserved, to discharge or retire you at any time for any reason not prohibited by statute, without the Company or any Affiliate being required to show cause for the termination.

7.      Taxes.  The Company shall withhold from payments to you under the Plan all taxes required by law, as determined in the sole and reasonable discretion of the Company.

8.      No Representations of Company or its Management.  Neither the Company nor its Affiliates nor its or their management makes any representation or warranty that the Company or its Affiliates or any Project will perform in a manner so as to result in the payment of any amount to you under the Plan.  The business of the Company and its Affiliates and the acquisition, operation, development and disposition of each Project will be conducted in the sole discretion of the Company and its Affiliates, the management of the Company and its Affiliates and the parties having management authority over the Projects.  Except for failure to make payments required by this Plan, neither the Company nor any of its Affiliates, nor any officer, partner or employee of the Company or any of its Affiliates, shall be liable to you or any relative, heir, assignee, transferee or representative of you for any action taken or omitted in connection with the business of the Company or its Affiliates or the operation or development of any Project or the interpretation of the provisions of the Plan.

9.      Agreements Regarding Confidential Information and Business Opportunities.  In connection with your employment with the Company or any of its Affiliates, you will be exposed to and may obtain certain information regarding the business and operations of the Company and its Affiliates and the Projects, which information is unique, valuable, considered trade secrets and deemed proprietary by the Company.  For the purposes of this Agreement, such information is referred to as "Confidential Information" except that the following shall not be considered Confidential Information: (i) information released from confidential treatment by written consent of the Company; and (ii) information disclosed and made available to the general public not in violation of a confidentiality obligation.  By accepting the benefits of the Plan, you agree that at all times, whether during your employment with the Company or any of its Affiliates or after such employment ceases: (i) all Confidential Information is and will remain the property of the Company and its Affiliates; (ii) you will hold in strictest confidence all Confidential Information; and (iii) you will not directly or indirectly duplicate, sell, use, lease, commercialize, disclose or otherwise divulge to any person or entity any portion of the Confidential Information, or use any of the Confidential Information for your benefit or profit, or allow any person, entity or third party other than the Company and its Affiliates or authorized employees of the Company and its Affiliates to use or otherwise gain access to any of the Confidential Information.

In addition, by accepting the benefits of the Plan, you agree that in the event of the cessation of your employment with the Company and its Affiliates you will not for a period of six months following the Termination Date, (x) pursue for economic benefit the acquisition of any real estate projects or real estate project land sites which were actively pursued by the Company or its Affiliates on or prior to the Termination Date, or (y) recruit or hire, or attempt to recruit or hire, any employee of the Company or any of its Affiliates, without the prior written consent of the Company.

In the event of a breach or threatened breach by you of any of the provisions of this Paragraph 9, the Company and Affiliates of the Company shall be entitled to an injunction restraining you from (x) disclosing, in whole or in part, the Confidential Information, (y) acquiring or attempting to acquire any real estate projects or real estate project land sites referred to in the immediately preceding paragraph, or (z) recruiting or hiring, or attempting to recruit or hire, any employee of the Company or any of its Affiliates, without the prior written consent of the Company, as the case may be. Nothing herein shall be construed as prohibiting the Company or any Affiliate of the Company from pursuing any other remedies available to it, including the recovery of damages. The Company shall have the right to offset against the amount of payments due under the Plan all damages suffered by the Company, JPIIC, the JPI Group or any of their Affiliates as a result of a breach or threatened breach of this Paragraph 9 by you.

10. **Working Capital Cost.** In connection with the calculation of your Service Company Participation Amount a fixed expense for the cost of working capital cash will be charged each year by the Company (as provided in Exhibit A)

11. **Contingency Reserve.** If in connection with the calculation of a Real Estate Participation Amount for a Commenced Project a contingency reserve is established by the Company (as provided in Exhibit C), and such contingency reserve has not been reduced to zero as of the first day on which you no longer have any interest in such Real Estate Participation Amount, the Company shall promptly pay to you an amount equal to the sum of (x) your Real Estate Participation Percentage for such Commenced Project times the amount of such contingency reserve as of that date, and (y), subject to the provisions of Paragraph 12 hereof, interest thereon at an annual rate of 9.5% compounded monthly for the period from the date the contingency reserve was established through the date on which the payment, if any, required by this Paragraph 11 is made.

12. **Interest on Late and Certain Other Payments.** Except as provided hereinafter, any payment required to be made to you pursuant to this Plan which is not timely made shall bear interest of an annual rate of 9.5% compounded monthly, with such interest accruing from the date such payment was required to be made through the date of actual payment thereof. The foregoing notwithstanding, no interest shall be accrued or paid with respect to (x) a late payment made to you under the Plan or (y) any amount payable to you described in Paragraph 2B or 11 of this Agreement unless the accrued interest thereon exceeds $100.

13. **Termination with Cause.** Notwithstanding the other provisions of this Plan granting you incentive compensation rights, in the event that your employment with the Company or any of its Affiliates is terminated for fraud, misrepresentation, misconduct or any other form of cause, all rights to compensation or any other interest in any unpaid Real Estate Participation Amount or any past or future profits of the Company, its Affiliates or any Project as otherwise provided herein shall be forfeited.

14. **Amendments and Modifications; Termination.** Except as otherwise specifically provided herein to the contrary, no change, amendment or modification to this Plan which would affect your rights hereunder on a retroactive basis shall be effective unless such change, amendment or modification is set forth in a written amendment to this Plan signed by you and

the Chairman of the Board and Chief Executive Officer of the Company. The foregoing notwithstanding, the Company shall have the right, in its sole discretion, (x) to terminate this Plan at any time and (y) to make any change, amendment or modification to this Plan which does not affect your rights hereunder which have accrued prior to the effective date of such change, amendment or modification.

15. **Effective Date.** This Agreement shall be effective as of **June 19, 2006**, and shall continue in full force and effect thereafter until otherwise terminated pursuant to the provisions thereof.

16. **Entire Agreement.** This Plan sets forth the entire arrangement among you, the Company, the JPI Group and their Affiliates concerning any profit sharing, profit based bonus or similar arrangements with respect to any of such entities or their businesses, and this Plan supersedes all prior agreements, written or oral, between you and any of such entities concerning such matters.

17. **Special Rules Regarding Buy-Out of Third Party Owners.** For purposes of this paragraph 17, the term "JPI Purchasing Group" shall mean each of J. Frank Miller, III, Robert D. Page, Ronald D. Ingram and Frank B. Schubert, Jr. (the "Executive Group"), together with any entity that is directly or indirectly controlled by one or more members of the Executive Group. In the event the JPI Purchasing Group directly or indirectly acquires an ownership interest from a third party in a Project, or in an entity that owns a Project, such acquisition by the JPI Purchasing Group shall be deemed to be a purchase and sale of the Project for purposes of this Plan, and thereafter you shall have no further interest in such Project unless such Project is specifically added to your Exhibit B after the date of such acquisition by the JPI Purchasing Group. For purposes of this Plan and the calculation of any amounts owing to you under this Plan with respect to such Project as a result of the deemed purchase and sale resulting from the acquisition of the Project by the JPI Purchasing Group, the Project shall be deemed to have been sold for either (i) the price paid by the JPI Purchasing Group if the entire direct or indirect interest in the Project, or entity owning the Project, is acquired by the JPI Purchasing Group, or (ii) the implied value for the entire direct or indirect interest in the Project, or entity owning the Project, based on the amount paid to any third party for the third party's direct or indirect interest in the Project, or entity owning the Project, if less than the entire interest in the Project, or the entity owning the Project, is acquired by the JPI Purchasing Group.

18. **Special Provisions Regarding Reduction in Real Estate Participation Percentage Upon the Occurrence of a Termination Date.** Notwithstanding the other provisions of this Agreement, the Company shall have the option for a period of six (6) months after your Termination Date to decide whether or not the reductions in your Real Estate Participation Percentage described in the third and four paragraphs of Paragraph 4 of this Plan will be applied to the Post Amendment Projects. The Company may make an election regarding the reduction for the Post Amendment Projects by delivering written notice thereof to you within six (6) months after your Termination Date. The reductions must be applied, or not applied, as selected by the Company, to all Projects as a class. If no election is made by the Company within such six (6) month period, the Company will be deemed to have elected to apply the reduction to all Projects. The provisions of this Paragraph 18 shall have no effect on any Project that is not a

Project, and the reductions in your Real Estate Participation Percentage shall automatically apply to all Projects.

19. **NOT A PARTNERSHIP. NOTWITHSTANDING THAT IN CERTAIN PROMOTIONAL OR OTHER LITERATURE OR ON BUSINESS CARDS OR OTHER CORRESPONDENCE OR IN INTERNAL OR EXTERNAL COMMUNICATIONS OR DISCUSSIONS YOU MAY BE REFERRED TO AS A "PARTNER", YOU AND THE COMPANY ACKNOWLEDGE AND AGREE THAT NOTHING IN THIS AGREEMENT OR IN ANY OTHER ARRANGEMENT BETWEEN YOU AND THE COMPANY OR ANY OF ITS AFFILIATES HAS CREATED OR IS INTENDED TO CREATE A PARTNERSHIP BETWEEN YOU AND THE COMPANY OR YOU AND ANY OF THE COMPANY'S AFFILIATES (INCLUDING, WITHOUT LIMITATION, ANY PROJECTS), AND THAT NO SUCH PARTNERSHIP EXISTS, AND THAT SUCH USAGE OF THE DESIGNATION "PARTNER" AS NOTED ABOVE IS STRICTLY FOR CONVENIENCE IN A NON-LEGAL SENSE AND IS NOT INTENDED TO HAVE ANY LEGAL EFFECT BETWEEN YOU AND THE COMPANY OR YOU AND ANY OF THE COMPANY'S AFFILIATES. THE RELATIONSHIP BETWEEN YOU AND THE COMPANY IS PURELY CONTRACTUAL AS AN EMPLOYEE AT WILL AND YOU ACKNOWLEDGE THAT YOU HAVE NO DIRECT, INDIRECT OR BENEFICIAL INTEREST OF ANY KIND IN THE COMPANY OR ANY OF ITS AFFILIATES, IN ANY PROJECT OR IN ANY REAL PROPERTY (OR RIGHTS TO ACQUIRE SUCH PROPERTY) OWNED BY THE COMPANY OR ITS AFFILIATES, EXCEPT AS SET FORTH IN THIS PLAN. THIS CONTRACT DOES NOT CREATE AN EMPLOYER/EMPLOYEE RELATIONSHIP BETWEEN YOU AND ANY OF THE COMPANY'S AFFILIATES.**

Very truly yours,

**JPI PARTNERS, LLC**

By: _____

Date: _____6/16/06_____

Agreed to this 16th day of ____June____, 2006

_____

**GLEN VENTROMILE**

<u>GLEN VENTROMILE</u>

EXHIBIT A

**AREA PARTNERS PROFIT PARTICIPATION PLAN**

ADJUSTED CASH FLOW

The Adjusted Cash Flow from the JPI Service Company Operations in a Designated Geographic Area for purposes of determining whether a Plan participant has earned a Service Company Participation Amount and when and how much of such amount is payable shall be determined in accordance with the following procedures. An example of a calculation of Adjusted Cash Flow is attached as Annex I to this Exhibit A. For these purposes, only the revenues and expenses attributable to the participant's designated JPI Service Company Operations in the participant's Designated Geographic Area shall be taken into account, except as otherwise provided in Annex I to this Exhibit A.

Adjusted Cash Flow shall be calculated for each semiannual period as follows:

(i)   Add all of the participant's designated JPI Service Company Operations revenues attributable to the Designated Geographic Area for the period, as reported in the JPI Companies' Monthly Operating Report (the "Red Book") for the period.

(ii)  Deduct all of the participant's designated JPI Service Company Operations expenses attributable to the Designated Geographic Area (including allocations and construction overrun reserves and charges and capital expenditures, excluding depreciation) paid or accrued for the period, as reported in the Companies regular accounting records for the period.

(iii) Deduct all preferred return amounts attributable to the JPI Service Company Operations in the Designated Geographic Area paid or accrued for the period to or for the benefit of the owners of the Company and its Affiliates (such owners being General Electric Capital Corporation and its affiliates, JPI Principals L.P. and its affiliates, and JPI/H Limited Partnership and its affiliates). Such preferred return shall accrue at an annual rate of 9.5% compounded monthly on General Electric capital and 15% on JPI capital. In no event shall any other cash disbursements to the owners of the Company and its Affiliates be deducted. Furthermore, no deductions shall be made for any payments under this Plan or under the Company's **Divisional, Regional or Area Partners Profit Participation Plans.**

(iv)  Abandoned Project Costs are charged to real estate operations. For purposes of this Agreement and the Plan, these expenses will be deducted

*APPP – Effective June 19, 2006*
*Participant Copy*

currently as a part of JPI Service Company Operations. If you are not assigned participation in the JPI Service Company Operations, your Abandoned Project Costs will be reported to you separately on a semi-annual basis and deducted against Adjusted Project Cash Flow for purposes of calculating your Real Estate Participation Amount. Certain accounting procedures related to this cost are set forth in the Accounting Procedures section 1 below.

(v)     For the purpose of this Adjusted Cash Flow calculation only, deduct an amount equal to **$12,500 per semi-annual period ($25,000 annually)**, as a cost for maintaining cash available for working capital.

(vi)    The amount, whether positive or negative, after the application of (i), (ii), (iii), (iv) and (v) above is the "Cash Flow" for the period.

(vii)   If the Cash Flow for the period is negative, no Service Company Participation Amount under the Plan is payable. To the extent the Cash Flow for the period is positive, deduct any cumulative negative Cash Flow for the period from the Plan Date of the Plan for the Plan participant through the last day of the period ended immediately prior to the semiannual period for which the calculation hereunder is being made. Cash Flow shall be further reduced by accrued and unpaid interest on such cumulative negative Cash Flow. Such interest shall accrue at an annual rate of **9.5%** compounded monthly. Any positive Cash Flow remaining after the application of this clause (vii) is the "Adjusted Cash Flow."

(viii)  A Plan participant's Service Company Participation Amount shall be equal to his or her Company Participation Percentage times the Adjusted Cash Flow as determined in (i) through (vii) above.

## ACCOUNTING PROCEDURES

1.      Abandoned Project Costs ("APC") are accumulated by region, and allocated to the region's committed projects on an annual plan year basis. For purposes of this Agreement and the Plan, the APC will be a current year deduction to the participant's calculation, as applicable, in the period the write-off is incurred. For purposes of this Agreement and the Plan, except as set forth in the last sentence of this Paragraph 1 for participants who have no participation in Service Company Operations, upon the sale of a Project, the APC equity and the related preferences on that equity will be added back to the Adjusted Project Cash Flow for the Project, thereby increasing Adjusted Project Cash Flow for Plan distribution purposes since the APC equity amount has already been deducted when incurred. Upon the occurrence of a termination date the Company shall have 180 days from the Termination Date to review pursued projects to determine final Abandoned Project Costs attributable to the participant at which time such costs shall be charged as the final Service Company Operation charge. If a participant has no participation in Service Company Operations, the APC will be reported to the participant separately in the semi-annual reporting and deducted against the participant's Adjusted Profit Cash Flow for purposes of calculating the participant's Real Estate Participation Amount.

2.      Each Plan participant's calculation for each calendar year will be reduced by all APC write-offs for the entire calendar year. A participant entering the Plan will have 120 days from the Plan Date for the participant's Plan to negotiate a fixed APC "credit" amount (in order to carve out those APC amounts which are deemed to be pre-existing in nature prior to such Plan Date). All such credited amounts must be evidenced by a written document executed by the participant and the Chairman of the Board and Chief Executive Officer of the Company. All such credited amounts will be added back to the participant's calculation for the year in which the participant enters the Plan. (Negotiation of "credit" not applicable to existing participants, new participants only.)

**GLEN VENTROMILE**

EXHIBIT C

**AREA PARTNERS PROFIT PARTICIPATION PLAN**

ADJUSTED PROJECT NET CASH FLOW

The Adjusted Project Cash Flow for each Commenced Project for purposes of determining whether a Plan participant has earned a Real Estate Participation Amount and when and how much of such amount is payable shall be determined in accordance with the following procedures. For these purposes, Adjusted Project Cash Flow includes both revenues and expenses from the ownership and operation of the Commenced Project and revenues and expenses from a sale or refinancing of the Commenced Project. An example of a calculation of Adjusted Project Cash Flow is attached as Annex I to this Exhibit C.

Adjusted Project Cash Flow shall be calculated on a project-by-project basis as follows:

(i)     Subject to (iv) below, add all revenue attributable to the Commenced Project for the period. Revenue shall include proceeds from the sale or refinancing of the Commenced Project and all cash distributions from the operations of the Commenced Project. In the case of the sale of a Commenced Project, the Project's cash balances shall be included as revenue.

(ii)    Subject to (iv) below, deduct all expenses, whether paid or accrued, attributable to the Commenced Project for the period. Expenses shall include, but not be limited to, all debt and accrued interest, annual asset management fees, closing costs, capital improvements and expenditures, and transaction costs. In addition, all return of equity payments and preferred return payments made to the owners of the Company and its Affiliates shall be deducted (such owners being General Electric Capital Corporation and its affiliates, Ray L. Hunt and his affiliates, JPI Principals, L.P. and its affiliates, and JPI/H Limited Partnership and its affiliates). Such preferred return payments accrue at an annual rate of 9.5% compounded monthly (except for projects in which JPILAC and its subsidiaries (the "JPILAC Group") do not have an ownership interest, which shall accrue at an annual rate of 20% compounded monthly) and shall be deducted in the period in which they are paid. In addition, return of any working capital advances and interest thereon at an annual rate of 9.5% compounded monthly shall be deducted (except for projects in which the JPI Group does not have an ownership interest, for which interest at an annual rate of 20% compounded monthly shall be deducted). No other amounts payable to the owners of the Company and its Affiliates shall be deducted in calculating Adjusted Project Cash Flow. Furthermore, no deductions shall be made for any payments under this

Plan or under the **Company's Divisional, Regional or Area Partners Profit Participation Plans.**

(iii)   If a Commenced Project is sold, deduct any working capital reserves and warranty reserves deemed necessary by the Company to cover any accrued liabilities, as well as to provide funds for any future warranty claims.

(iv)   For purposes of (i) and (ii) above, revenues and expenses shall be adjusted as appropriate to reflect the interests, if any, of third parties (other than Residential Ventures, L.P. and Hunt-JPI Corporation) in a Commenced Project.

(v)   Deduct the amount calculated in accordance with Accounting Procedure number 3 on Exhibit A for the period.

(vi)   Pursuant to Accounting Procedure number 1 on Exhibit A, no deduction shall be made for any APC equity or the related preferences on that equity.

(vii)   The amount, whether positive or negative, after the application of (i), (ii), (iii), (iv), (v) and (vi) above is the Unadjusted Adjusted Project Cash Flow.

(viii)   The Company may establish a "Contingency Reserve" to satisfy any current or future cash requirements for any or all Commenced Projects. The Company (in its reasonable discretion) may reserve all, or a portion of, Unadjusted Adjusted Project Cash Flow as calculated above for such purposes. Accordingly, Unadjusted Adjusted Project Cash Flow shall be reduced for any increase to the Contingency Reserve, and increased for any amounts no longer required for the Contingency Reserve. Amounts maintained in the Contingency Reserve shall bear interest at an annual rate of 9.5% compounded monthly, and, subject to the provisions of Paragraph 12 of the Plan, accrue to the benefit of Plan participants.

(ix)   The Adjusted Project Cash Flow for the Commenced Project shall be the amount resulting from the application of (viii) above to the Unadjusted Adjusted Project Cash Flow determined in (i) through (vi) above.

(x)   Each Plan participant's Real Estate Participation Amount with respect to the Commenced Project shall be equal to his or her Real Estate Participation Percentage times the Adjusted Project Cash Flow.

(xi)   A "true-up" to compare the actual disbursements made subsequent to the sale of a Commenced Project and the amounts reserved in accordance with item (iii) above shall be made, and any additional Real Estate Participation Amount resulting from such "true-up" shall accrue interest at an annual rate of 9.5% compounded monthly and, subject to the provisions of Paragraph 1 of the Plan, be paid within 15 business days thereafter.

GLEN VENTROMILE

EXHIBIT D

AREA PARTNERS PROFIT PARTICIPATION PLAN

DESIGNATED GEOGRAPHIC AREA

Northeast Region

AND

DESIGNATED JPI SERVICE COMPANY OPERATIONS

All Service Company Operations for the Northeast Region

## GLEN VENTROMILE

## ADDENDUM TO

## PARTNERS PROFIT PARTICIPATION PLAN

THIS ADDENDUM (this "Addendum") is made as of **June 19, 2006**, to be effective as of **June 19, 2006**, by the undersigned. The terms of this Addendum may be revised at the discretion of the Company. Unless otherwise stated in this Addendum, terms defined in the Profit Participation Plan (defined below) have the same meanings when used in this Addendum.

RECITALS:

A.    JPI Partners, LLC has provided to the undersigned employee certain incentive compensation pursuant to its **Partners Profit Participation Plan** (as amended, the "Profit Participation Plan").

B.    The undersigned have agreed to amend the Profit Participation Plan as set forth herein.

1) Special Provisions. Notwithstanding any other provisions of this Plan, JPI will pay incentives according to the following parameters for the first three years of employment:

i. $50,000.00 per each executed deal as approved by the Investment Committee, put through due diligence, and earnest money put at risk.

ii. $100,000.00 per each deal with a completed purchase of land.

For the first three years of employment a minimum of $100,000.00 bonus will be paid as approved by the Company and the Participant must be employed by the Company. The above stated bonus is not a draw and will not be netted with future Profit Participation payments. After thirty-six months of employment, the terms of the Profit Participation Plan only is in effect.

By: _____
J. Frank Miller, III, Chairman of the Board
and Chief Executive Officer

Date: _____6/6/06_____

By: _____
GLEN VENTROMILE

Date: _June 16th, 2006_

APPP – Effective June 19, 2006
Participant Copy

Index No. 23404/2007          Year 20

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

GLEN VETROMILE,

                                   Plaintiff,

        -against-

JPI PARTNERS, LLC,

                                   Defendant.

**SUMMONS AND COMPLAINT**

**Greenfield Stein & Senior, LLP**

Attorney for  *Plaintiff*
Office and Post Office Address, Telephone
**600 THIRD AVENUE**
Borough of Manhattan      New York, N.Y. 10016
(212) 818-9600

Attorney(s) for

Service of a copy of the within                    is hereby admitted.

Dated,

Attorney(s) for   2007111190 357

2007111190 484

SERVICO 35