UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X
GLEN VETROMILE,

                        Plaintiff,

             -against-

JPI PARTNERS, LLC,

                      Defendant.
-------------------------------------------------------------------- X

:   07 Civ. 11032 (KMK)

 :

 :

 :

**PLAINTIFF'S MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTON FOR SUMMARY JUDGMENT**

Greenfield Stein & Senior, LLP
600 Third Avenue, New York, N.Y. 10016
(212) 818-9600

## **TABLE OF CONTENTS**

STATEMENT OF FACTS ............................................................................................ 2

ARGUMENT .............................................................................................................. 12

I.    VETROMILE IS ENTITLED TO THE INCENTIVE PAYMENTS WITH
      REGARD TO THE MARITIME YARDS TRANSACTION ........................................... 12

II.   VETROMILE IS ENTITLED TO THE ADDITIONAL BONUS WITH
      RESPECT TO HIS FIRST YEAR OF EMPLOYMENT AT JPI..................................... 15

III.  VETROMILE IS ENTITLED TO SEVERANCE............................................................ 20

IV.   PLAINTIFF'S CLAIMS FOR  QUANTUM MERUIT AND UNJUST
      ENRICHMENT  SHOULD BE HELD IN ABEYANCE ................................................. 21

CONCLUSION............................................................................................................. 22

## **TABLE OF AUTHORITIES**

**Cases**

833 Northern Corp. v. Tashlik & Assoc., P.C., 256 A.D.2d 535, 683 N.Y.S.2d 111 (2d Dept. 1998) ..................................................................................................................... 16

Allison v. Fundamental Brokers Inc., 1991 U.S. Dist. LEXIS 4150 (S.D.N.Y. 1991) ..... 15, 19-20

Bennett v. Gill & Duffus Chemicals Inc., 1987 W.L. 34256 (S.D.N.Y. 1987) ........................... 20

Bessemer Trust Co. v. Branin, 498 F.Supp.2d 632, 638-39 (S.D.N.Y. 2007) ............................. 19

Dalton v. Educational Testing Services, 639 N.Y.S.2d 977, 979 (1995) ..................................... 19

Elsky v. Hearst Corp., 232 A.D.2d 310, 648 N.Y.S.2d 592 (1st Dept. 1996) ............................. 16

Giordano v. Thomson, 438 F.Supp.2d 35, 41 (E.D.N.Y. 2005) .................................................. 20

Grey v. Federal Deposit Insurance Corp., 1998 U.S. Dist. LEXIS 12653 (S.D.N.Y. 1998) .................................................................................................. 12, 13, 14

In re Lipper Holdings, LLC, 1 A.D.3d 170, 766 N.Y.S.2d 561 (1st Dept. 2003) ...................... 16

Jacobson v. Sassower, 66 N.Y.2d 991, 499 N.Y.S.2d 381 (1985) ............................................... 17

Mandelblatt v. Devon Stores, Inc., 132 A.D.2d 162, 521 N.Y.S.2d 672 (1st Dept. 1987) ........... 17

Matter of Friedman, 64 A.D.2d 70, 407 N.Y.S.2d 999 (2d Dept. 1978) ..................................... 17

O'Dell v. Transworld Entertainment Corp., 153 F.Supp. 2d 378 (S.D.N.Y. 2001), aff'd, 40 Fed. Appx. 628 (2d Cir. 2002) ................................................................................ 15

Reape v. New York News, Inc., 122 A.D.2d 29, 504 N.Y.S.2d 469 (2d Dept.), appeal denied, 68 N.Y.2d 610, 508 N.Y.S.2d 1027 (1986) ..................................................... 16

River View Assoc. v. Sheraton Corp. of Amer., 33 A.D.2d 187, 190, 306 N.Y.S.2d 153, 156 (1st Dept. 1969), aff'd, 27 N.Y.2d 718, 314 N.Y.S.2d 181 (1970) ............................ 16-17

Tagare v. Nynex Network Systems Co., 994 F.Supp. 149, 159 (S.D.N.Y. 1997) ....................... 19

Tougher Heating & Plumbing Co. v. State, 73 A.D.2d 732, 423 N.Y.S.2d 289 (3d Dept. 1979) .................................................................................................................. 16

Travelers International AG v. TransWorld Airlines Inc., 41 F.3d 1570, 1575 (2d Cir. 1994) ..... 18

Truelove v. Northeast Capital Advisory Inc., 95 N.Y.2d 220, 715 N.Y.S.2d 366 (2000) ........... 15

Weiner v. Diebold Group Inc., 565 N.Y.S.2d 959, 961 (1st Dept. 1991) ..................................... 18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X

GLEN VETROMILE,

                             Plaintiff,

                  -against-

JPI PARTNERS, LLC,

                            Defendant.

------------------------------------------------------------------- X

:  07 Civ. 11032 (KMK)

:

:

:

:

## PLAINTIFF'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
## AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTON FOR SUMMARY JUDGMENT

       This memorandum is submitted on behalf of plaintiff Glen M. Vetromile in opposition to the defendant's motion for summary judgment and in support of Vetromile's cross-motion for summary judgment.

       A careful analysis of the contractual arrangements between the parties establishes that Vetromile is indeed entitled to judgment as a matter of law with regard to his claims.

       Contrary to JPI's contentions, the contract between the parties did not require Vetromile to be employed for any particular period of time, or to be employed at the times of any particular events (i.e., the date on which payment of the bonus was to be made, the date on which earnest money was put at risk in connection with the Maritime Yards transaction, or the date on which the contract concerning the purchase of land was consummated), in order to be entitled to the incentive payments at issue in this case.

The cases upon which JPI relies involved contractual language different from that presented here and accordingly do not support JPI's contentions. Instead, a straightforward reading and application of the contract language actually set forth in the contractual documents involved in this case indicates that Vetromile is entitled to the incentive payments, i.e., the $100,000 bonus for his first year of employment and the $150,000 in incentive payments with regard to the Maritime Yards transactions, as well as a 2% share in the Maritime Yards project pursuant to the Profit Participation Plan.

In addition, the evidence shows that JPI did not in fact follow the written guidelines for severance which it has presented in support of its motion but instead engaged in a looser and more generous method of computing severance. Vetromile is entitled to payment of severance pursuant to the actual methods and practices employed by JPI and is not bound by the written policy which has not been shown to have been followed by JPI.

## **STATEMENT OF FACTS**

The matters in dispute in this litigation concern incentive payments to which Vetromile asserts entitlement pursuant to the Profit Participation Plan, a copy of which is attached as Exhibit A to defendant's moving papers. It should be noted at the outset that the employment letter (copy annexed to defendant's moving papers as Exhibit C) does not specifically address the bonus and incentive payments. The employment letter (Exhibit C) therefore is relevant and noteworthy primarily for what it does not say.

Specifically, the employment letter does not require or provide that Vetromile had to be employed on the date when bonuses were paid in order to be eligible for a particular bonus, it does not state that he had to be employed for an entire year in

- 2 -

order to be entitled to the bonus to be paid with respect to that year, and it does <u>not</u> specify that he would have to perform any particular work or services in order to be entitled to the incentive payments with respect to a particular project.  Accordingly, the employment letter (Exhibit C) provides no support whatsoever for JPI's attempts to deny Vetromile bonus and incentive payments on the grounds that he did not perform certain work, that he was not an employee on the date of bonus payment, and that he was not employed for a full 12 months.

The employment letter does specify that Vetromile was an "at will" employee (Exhibit C at p. 2).  For this reason, Vetromile has not asserted entitlement to the annual bonuses and salary for all three of the years covered by the employment contract.  Vetromile concedes that JPI did indeed have the right to terminate his employment without cause.  Having done so, it does not have an obligation to pay Vetromile's salary and bonus for the second and third years of the employment agreement.  The termination, however, does not (either as a matter of law or pursuant to the language of the employment letter itself) create a forfeiture of amounts earned by Vetromile during the actual period of his employment.

In order to determine the amounts to which Vetromile was and is entitled based on the actual period of his employment, it is necessary to look carefully at the Profit Participation Plan (Exhibit A to defendant's moving papers).  The Profit Participation Plan does not spell out in any detail the services which were to be rendered by Vetromile and does not mandate or require the provision of any particular level of services or activity with respect to a particular project in order for Vetromile to be entitled to benefits under the Plan.  Instead, the Plan states simply on page 1, in the first

paragraph, that Vetromile's compensation under the Plan was to be based on the cash flow "from real estate projects in which you are a participant during your employment." Since it is undisputed that Vetromile was a participant in the Maritime Yards project, there is no basis for JPI to deny him the benefits of the Profit Participation Plan with respect to that project.

Initially, it is vital to note that this language states merely that Vetromile was required to be "a participant during [his] employment" – it does not, either expressly or by implication, state that the project had to be concluded, or had to have reached any particular stage, during the term of Vetromile's employment in order for Vetromile to be entitled to the benefits of the Profit Participation Plan with respect to that particular project.

To the extent that there is any question concerning what services Vetromile was required to, or should have, provided with respect to a particular project, the evidence is clear that his role was to be the originator of transactions. That is, Vetromile was hired to be a business getter, to "source," initiate and bring in real estate projects for JPI to handle.

The evidence in the record establishes that Vetromile was hired by JPI to be JPI's New York area partner, to lead its New York office, to help grow the team that was in that office and "to source new deals." Crisalli deposition (copy annexed to Shoemaker Affidavit as Exhibit 4) at p. 14.

Thomas O'Brien, the regional manager during Vetromile's employment with JPI, also testified that Vetromile's job "was to find development transactions."

Transcript of deposition of Thomas O'Brien, copy annexed as Exhibit 6 to the Shoemaker Affidavit, at pp. 55-56. O'Brien testified specifically that the origination of transactions – as opposed to handling of the acquisition process and other duties – was Vetromile's job. Id.

In the e-mail which Mr. O'Brien sent to the JPI organization at the time of Mr. Vetromile's hiring, Mr. O'Brien stated that Vetromile would "be responsible for acquiring and managing new development opportunities in New York." See Exhibit 2 to Shoemaker Affidavit.

Indeed, defendant's own Rule 56.1 Statement acknowledges that, in hiring Vetromile, JPI was looking for a managing partner for its New York office to create and build JPI's business in that territory (¶ 1 of JPI's Rule 56.1 Statement).

Moreover, it is undisputed that Vetromile did in fact bring in the new development opportunity known as Maritime Yards. The principal of Maritime Yards, Clay Fowler, so states in his affidavit (Exhibit 3 to the Shoemaker Affidavit). Mr. Fowler states that it was only because of his friendship and professional relationship with Vetromile that he provided information about the Maritime Yards investment to JPI (Fowler Affidavit, ¶ 7). Mr. Fowler further states that he brought the Maritime Yards project to JPI "solely and exclusively because of my relationship with, knowledge of, and trust and confidence in Glen Vetromile." Fowler Affidavit, ¶ 10.

Mr. Fowler acknowledged that other employees of JPI worked on the project but stated that "the project was, to the best of my knowledge, brought into JPI and originated solely and exclusively by Glen Vetromile." Fowler Affidavit, ¶ 11.

When JPI took his deposition, Mr. Fowler confirmed what he had stated in his affidavit. He testified that he would not have done the Maritime Yards transaction with JPI had it not been for Glen Vetromile (Fowler Deposition, copy annexed to Shoemaker Affidavit as Exhibit 5, at p. 9), and he stated that he would not have known who JPI was if Glen Vetromile had not called him. Id. at p. 34.

Inasmuch as Vetromile's job was to originate transactions, and inasmuch as he indisputably did originate the Maritime Yards transaction, there can be no contention by JPI that Vetromile did not perform the expected services with respect to the Maritime Yards project in order to be entitled to benefits under the Profit Participation Plan.

JPI's after-the-fact contention that Mr. Vetromile was required to perform certain additional services or to work through certain milestones before being entitled to payment (a) is not required by the terms of the Profit Participation Plan itself and (b) is not consistent with the substantive reason for which Vetromile was hired.

Moreover, JPI's attempts to downplay the work that Vetromile did with respect to the Maritime Yards transaction are without merit for a variety of reasons. First of all, JPI terminated Vetromile's employment without cause (see Vetromile deposition, copy attached to defendant's moving papers as Exhibit F, at p. 88) (reason given for termination was "cultural differences"). Vetromile was ready, willing and able to perform any and all services required to conclude the transaction but was prevented from doing so by JPI's own actions.

Furthermore, the fact is that Vetromile did indeed provide substantial services above and beyond simply introducing Mr. Fowler to JPI. As testified by Mr. Fowler himself, Mr. Fowler and Mr. Vetromile negotiated the transaction, Vetromile prepared numerous drafts of the memorandum of understanding, and it was in substantially final form when Vetromile left JPI. The subject matters covered and the discussions between Vetromile and Fowler included price, due diligence, timing and whether the subject property had to be leased in order for the transaction to be concluded. Fowler Deposition at p. 13. According to Fowler, all the major terms of the transaction letters were negotiated under Mr. Vetromile's hand. Fowler Deposition at p. 14. Indeed, Mr. Fowler went so far as to tell the principals of JPI, after they had fired Vetromile, that Vetromile was responsible for the Maritime Yards transaction and should be paid for it. Fowler Deposition at p. 37.

An employee of JPI, Paul Crisalli, whose deposition also was taken and who was the head of construction for JPI, confirmed that Mr. Vetromile not only made the introduction of Mr. Fowler to JPI, but also that Mr. Vetromile was involved in preparation of the Letter of Intent with respect to the transaction. Crisalli Deposition (Exhibit 4 to the Shoemaker Affidavit) at p. 17.

Mr. Crisalli's testimony also is significant inasmuch he confirmed that JPI was the only project brought into JPI's New York office subsequent to its initial project (known as Jefferson Place). Crisalli Deposition at pp. 12, 15-16. Thus, the only deal brought into the JPI office during the entire time period from 2001 to the present date, other than the pre-existing Jefferson Place project, was the Maritime Yards project which was initiated by Glen Vetromile. This is significant because it shows the substantial

value to JPI of Vetromile's efforts and also because it reveals the extremely inequitable and overreaching nature of JPI's actions with respect to Vetromile.  Instead of rewarding the only employee who originated any business for the office and who provided them with an opportunity to make the office viable, JPI terminated his employment without cause and sought to keep for itself all the financial benefits of the transaction he had originated.

Finally, to the extent that there is any suggestion that the Profit Participation Plan no longer is in place, Mr. Crisalli's testimony disproves that.  Mr. Crisalli stated that he himself is a participant in the Profit Participation Plan and that he has an interest under that plan with respect to the Maritime Yards project itself.  Crisalli Deposition at pp. 12, 18.  Thus, in addition to being contrary to the express terms of the contractual agreement between Vetromile and JPI, the denial of benefits to Vetromile is a gross affront.  Individuals who had much less to do with the project – and nothing whatsoever to do with originating the project – have been compensated with pieces of the project while Vetromile has not.

The language governing the bonus and incentive payments to be made to Vetromile by JPI is not in dispute.  That language is as follows:

> "The undersigned have agreed to amend the Profit Participation Plan as set forth herein.
>
> 1) Special Provisions.  Notwithstanding any other provisions of this Plan, JPI will pay incentives according to the following parameters for the first three years of employment:
>
>> i.      $50,000.00 per each executed deal as approved by the Investment Committee, put through due diligence, and earnest money put at risk.

- 8 -

> ii.    $100,000.00 per each deal with a completed purchase of land.
>
> For the first three years of employment a minimum of $100,000.00 bonus will be paid as approved by the Company and the Participant must be employed by the Company. The above stated bonus is not a draw and will not be netted with future Profit Participation payments. After thirty-six months of employment, the terms of the Profit Participation Plan only is in effect."

Profit Participation Plan (Exhibit A to defendant's moving papers) at p. 17.

With regard to the Maritime Yards transaction, or any deal, the document states that $50,000 will be paid for each deal "as approved by the Investment Committee, put through due diligence, and earnest money put at risk." The document does not state that any of the specified events must take place during the time period of Vetromile's employment, and it is undisputed that Maritime Yards deal was in fact approved by the Investment Committee, put through due diligence, and earnest money was put at risk.

The document also provides for an additional $100,000 bonus for each deal "with a completed purchase of land," and it is undisputed that there has been a completed purchase of land with respect to the Maritime Yards transaction.

Inasmuch as the document does not specify that the purchase of land was required to take place during Vetromile's employment, and inasmuch as Vetromile indisputably was a "participant" in the Maritime Yards project (as required at p. 1 of the Profit Participation Plan), there is no genuine issue of fact concerning Vetromile's entitlement to the $50,000 and $100,000 incentive payments on the Maritime Yards transaction.

Indeed, JPI itself recognized as much when, in its proposed agreement concerning Mr. Vetromile's termination, it provided that Vetromile would in fact receive

the $100,000 and $50,000 payments with respect to the Maritime Yards transaction (see Exhibit 1 to the Shoemaker Affidavit at p. 2).

It also is necessary to examine the precise language of the Profit Participation Plan with regard to the $100,000 annual bonus. First, the document refers to the $100,000 bonus as a "minimum" amount. The document further states that the bonus will be paid for "the first three years of employment." It does not specify that an employee must be employed for a full 12 months in order to be entitled to the bonus, nor does it specify that the employee must be employed as of the date of payment of bonuses in order to receive the bonus.

Instead, the qualifications are that the bonus will be paid "as approved by the Company and the Participant must be employed by the Company." Notably, the requirement that Vetromile must be employed by the Company is not a requirement of being employed for 12 months, or at the end of the year, or on the date of payment. Instead, it is simply a requirement of being employed, and indisputably, Vetromile was employed during the first year of his contractual arrangement. Accordingly, he has fulfilled that condition with respect to the first year.

For the reasons set forth below, the requirement of company approval is subject to the covenant of good faith and fair dealing and cannot be exercised in an arbitrary and capricious manner. Because Vetromile did indeed perform his duties and, in fact, was extremely successful inasmuch as he did originate the Maritime Yards transaction, there can be no basis for the Company to refuse to approve the bonus for him with regard to his first year of employment.

Finally, with respect to Mr. Vetromile's claim for severance, it is important to review the offer made at the time of the termination of his employment. (Exhibit 1 to the Shoemaker Affidavit).   At that time, the Company offered him severance pay in the amount of $35,128,31.

This offer obviously was not based on the chart contained in the document concerning severance upon which JPI now relies (since that chart would result in the payment of no severance at all).  Instead, Mr. O'Brien testified that the offer of severance for Mr. Vetromile was based on consultation among executives to determine an appropriate number of weeks of severance pay to be provided to Mr. Vetromile (O'Brien Deposition at pp. 57-58).  This is consistent with the document upon which JPI relies (Exhibit D to defendant's moving papers) inasmuch as that document says that the severance pay policy "is to be administered according to the discretion of management." Moreover, JPI's internal documentation states: "Is associate eligible for severance pay? Yes."  Shoemaker Affidavit, Exhibit 7.

Vetromile is entitled to be paid severance pursuant to the actual practices JPI as described by Mr. O'Brien, and not pursuant to a chart which has not been shown to have been implemented or followed by JPI.

## ARGUMENT

## I.
## VETROMILE IS ENTITLED TO
## THE INCENTIVE PAYMENTS WITH
## REGARD TO THE MARITIME YARDS TRANSACTION

As set forth above, JPI recognized and acknowledged Vetromile's entitlement to the Maritime Yards incentive payments in the termination letter which it presented to him (Shoemaker Affidavit, Exhibit 1). Because Vetromile would not sign the termination letter inasmuch as he was not satisfied with some of its others terms, however, JPI has failed and refused to make those payments to Vetromile.

The facts pertinent to Vetromile's entitlement to those payments are undisputed. Thus, it is not disputed that Vetromile in fact originated and introduced the Maritime Yards transaction to JPI.

JPI seeks to avoid its obligations, however, by asserting that there are certain prerequisites or preconditions to Vetromile's entitlement to the incentive payments even though such preconditions are not set forth in the contract between the parties (the Profit Participation Plan).

In this regard, JPI relies almost exclusively on a case (Grey v. Federal Deposit Insurance Corp., 1998 U.S. Dist. LEXIS 12653 (S.D.N.Y. 1998) (JPI Mem. at pp. 13-18)) which involved a contract having totally different language from the language of the contract at issue here.

JPI cites the <u>Grey</u> case as if it stood for the proposition that, in order to be paid with respect to a particular transaction, an employee must remain employed until the transaction is consummated. The <u>Grey</u> case, however, stands for no such thing.

Instead, in the <u>Grey</u> decision, Magistrate Judge Katz carefully analyzed the contract at issue in that case and concluded that the contract unambiguously provided that the bonus payments were only to be awarded for sales consummated during the term of the plaintiff's employment.

First, it is notable that Magistrate Judge Katz held that extrinsic evidence was not admissible where the contractual language unambiguously conveyed the parties' intent. <u>Grey</u> at *17-18. In violation of this precept, JPI relies extensively on the affidavit of its president, Jim Butz, in an attempt to put a gloss on and modify the language contained in the actual contract.

The actual contractual language at issue here, quoted above, does not say anything about the transaction being consummated during the period of Vetromile's employment and imposes no requirement that the "hurdles" be cleared during the period of his employment. A fair, logical and straightforward reading of the provision at issue here is that, where the employee participated in the transaction, the entitlement to payment would arise if and when those hurdles were cleared, regardless of whether that took place during the period of his employment.

This is to be contrasted with the language at issue in the <u>Grey</u> case, which was extensively quoted and analyzed by Magistrate Judge Katz.

In <u>Grey</u>, the contract stated that the plaintiff was not entitled to any bonus payments unless consideration was actually received during the plaintiff's initial nine-month employment term. <u>Grey</u> at *44. .

Moreover, in <u>Grey</u>, the contract required that the "actual disposition" of certain assets occur during the term of plaintiff's employment in order for him to qualify for a bonus. <u>Grey</u> *45.

Furthermore, the contract in <u>Grey</u> required that the plaintiff must have been successful "in arranging for and consummating the actual disposition" of certain assets. <u>Grey</u> at *46. The use of the word "consummating" in addition to the word "actual" further reinforced the court's conclusion that the transactions had to be concluded during the period of plaintiff's employment in order for plaintiff to be eligible for payment with respect to them.

The contract issue here, however, does not require Vetromile personally to consummate the transaction and does not refer to the receipt of consideration during the period of Vetromile's employment. Instead, the contract at issue here simply requires that Vetromile be a participant in the transaction – which he indisputably was – and the background and facts at issue here (to the extent that there is any ambiguity and that they are required to be reviewed) unambiguously indicate that Vetromile's role was to originate deals, not to process them. Accordingly, there is no basis for requiring that Vetromile had to "consummate" the transaction in order to be paid on it. The contractual language in <u>Grey</u> did so require, however, and that is the reason why Magistrate Judge Katz ruled against the plaintiff in <u>Grey</u>.

Utilizing Magistrate Judge Katz's approach here leads to precisely the opposite result. Here, the language of the agreement contains no requirement that Vetromile be employed at the time when certain "hurdles" are cleared and instead requires only that he be a participant in the project in order to be eligible for compensation on it.

## II.
### VETROMILE IS ENTITLED TO THE ADDITIONAL BONUS WITH RESPECT TO HIS FIRST YEAR OF EMPLOYMENT AT JPI

In attacking Vetromile's claim for the $100,000 bonus for his first year of employment, JPI relies on cases which are distinguishable on their facts. In the Truelove case (Truelove v. Northeast Capital Advisory Inc., 95 N.Y.2d 220, 715 N.Y.S.2d 366 (2000) (JPI Mem. at p. 11)), for example, the plaintiff resigned from his employment. Clearly, a resignation is a repudiation or forfeiture of a bonus payment since the resignation is a voluntary act on the part of the employee. Here, by contrast, Vetromile did not voluntarily resign but was terminated without cause.

In the other cases upon which JPI relies, for example, O'Dell v. Transworld Entertainment Corp., 153 F.Supp. 2d 378 (S.D.N.Y. 2001), aff'd, 40 Fed. Appx. 628 (2d Cir. 2002) (JPI Mem. at p. 10) and Allison v. Fundamental Brokers Inc., 1991 U.S. Dist. LEXIS 4150 (S.D.N.Y. 1991) (JPI Mem. At p. 11), the payment of the bonus to the employee plaintiff was expressly conditioned on plaintiff's employment on the payment date. Here, the Profit Participation Plan contains no such requirement and, in this respect, states merely that "the Participant must be employed by the Company."

The actual requirement set forth in the Profit Participation Plan reasonably and logically is interpreted as a requirement that the employee must be employed by the company during the year in question in order to be eligible for the bonus. Undeniably, Vetromile was employed during the first year of his employment with the company.

Any other interpretation which would permit the company to deprive the employee of his bonus by terminating his employment without cause with respect to a year in which he was employed would work a forfeiture and would be an unreasonable and harsh interpretation. Such interpretations are not favored and should not be made.

As a matter of law, "a contract should not be interpreted to produce a result that is absurd . . . commercially unreasonable . . . or contrary to the reasonable expectations of the parties . . ." In re Lipper Holdings, LLC, 1 A.D.3d 170, 766 N.Y.S.2d 561 (1st Dept. 2003) (citations omitted) citing Tougher Heating & Plumbing Co. v. State, 73 A.D.2d 732, 423 N.Y.S.2d 289 (3d Dept. 1979); Elsky v. Hearst Corp., 232 A.D.2d 310, 648 N.Y.S.2d 592 (1st Dept. 1996), and 833 Northern Corp. v. Tashlik & Assoc., P.C., 256 A.D.2d 535, 683 N.Y.S.2d 111 (2d Dept. 1998).

Where a particular interpretation would lead to an absurd result, the Court should reject such a construction in favor of one which would better accord with the reasonable intentions of the parties. Reape v. New York News, Inc., 122 A.D.2d 29, 504 N.Y.S.2d 469 (2d Dept.), appeal denied, 68 N.Y.2d 610, 508 N.Y.S.2d 1027 (1986).

Well-established principles of contract construction dictate that "[P]arties to an agreement are presumed to act sensibly . . . and an interpretation that produces an absurdly harsh result is to be avoided." River View Assoc. v. Sheraton Corp. of Amer.,

33 A.D.2d 187, 190, 306 N.Y.S.2d 153, 156 (1st Dept. 1969), aff'd, 27 N.Y.2d 718, 314 N.Y.S.2d 181 (1970).  Since there exists, in every contract, an implied covenant of good faith and fair dealing, a Court will properly take into consideration the fact that one construction would make the contract unconscionable and reject such a construction.  Thus, a Court will endeavor to give the construction most equitable to both parties instead of one which will give one of the parties an unfair or unreasonable advantage over the other.  Matter of Friedman, 64 A.D.2d 70, 407 N.Y.S.2d 999 (2d Dept. 1978).

In Mandelblatt v. Devon Stores, Inc., 132 A.D.2d 162, 521 N.Y.S.2d 672 (1st Dept. 1987), the Court held that construing the termination provision of an employment contract as effecting a waiver of the employer-defendant's right to sue the employee-plaintiff for any damages which his conduct might cause would produce an unreasonable result, placing one party at the mercy of the other, which was presumed by the Court to not have been what the parties intended.[1]  Indeed, the Court held that it would endeavor to give the construction most equitable to both parties instead of a construction which would give one of them an unfair and unreasonable advantage over the other.  132 A.D.2d at 167, 521 N.Y.S.2d at 676.

Furthermore, in cases of doubt or ambiguity, a contract must be construed most strongly against the party who prepared it, Jacobson v. Sassower, 66 N.Y.2d 991,

---

[1] This is especially so where the agreement, as in the case at bar, was repared by the party seeking to benefit from its construction.  Raw Silk Trading Co., Inc. v. Katz, 201 A.D. 713, 194 N.Y.S. 638 (1st Dept. 1922).

499 N.Y.S.2d 381 (1985).  Thus, to the extent that there is any doubt or ambiguity as to whether Vetromile had to work for a full year or be employed on the payment date, such doubt should be resolved against JPI, which prepared the contract.  Had JPI wanted to impose such a condition, it could and should have done so, but it did not.

In any event, even if there were a requirement that Vetromile remain until the payment date or for the full year, Vetromile was ready, willing and able to do so and JPI's own actions in terminating his employment without cause cannot, as a matter of law, eliminate his right to the bonus.  JPI made it impossible for Vetromile to perform by terminating his employment and cannot therefore invoke that termination as a basis for requiring Vetromile to forfeit the bonus.

Moreover, there is a longstanding policy in New York State against the forfeiture of earned wages.  Weiner v. Diebold Group Inc., 565 N.Y.S.2d 959, 961 (1st Dept. 1991).  Thus, public policy favors construing the contractual language so as to avoid a forfeiture.

The contention that compensation is "discretionary" is not the end of the matter.  Discretion with regard to bonuses – or any other item for that matter – is not synonymous with being capricious.  Discretion must be exercised within the range of reason in order to be upheld by the courts.  A total denial of a bonus, however, clearly is not reasonable and is indeed arbitrary and capricious and a violation of the implied covenant of good faith fair dealing.  Thus, the courts have recognized that, even where a contract confers discretion on one of the parties, the discretion is subject to an obligation that it be exercised in good faith.  See, e.g., Travelers International AG v. TransWorld

Airlines Inc., 41 F.3d 1570, 1575 (2d Cir. 1994); <u>Dalton v. Educational Testing Services</u>, 639 N.Y.S.2d 977, 979 (1995).

The courts also have held that where a contract contemplates the exercise of discretion, there is a requirement not to act arbitrarily or irrationally in exercising that discretion. <u>Id.</u>; <u>Tagare v. Nynex Network Systems Co.</u>, 994 F.Supp. 149, 159 (S.D.N.Y. 1997).

In sum, to the extent that the contract at issue may be argued to confer a measure of discretion on JPI by stating that payment of the $100,000 bonus will be "as approved by the Company," such discretion must be exercised within the bounds of reason and JPI has put forth no reason why it could or should have refused to pay the bonus to Vetromile.

It also must be noted that the language at issue here is far more narrow than the language at issue in the cases where bonus claims were rejected. Here, there is merely a requirement of approval by the Company which did not signal to Vetromile that his bonus was subject to being withheld within the Company's sole and exclusive discretion. <u>Compare</u> <u>Bessemer Trust Co. v. Branin</u>, 498 F.Supp.2d 632, 638-39 (S.D.N.Y. 2007) (JPI Mem. At p. 12), where the bonus plan set a discretionary bonus range between 0% and 250% of the base salary, thus clearly indicating that the employer had complete discretion.

The above-referenced distinctions between the cases upon which JPI relies and the facts presented here are distinctions that make a difference. In the <u>Allison</u> case, <u>supra</u>, for example, the court noted that there was no dispute that the plaintiff had

voluntarily left his employment with the defendant in order to join a competitor. After so noting, the court stated that: "Under these circumstances, the Court finds that Allison failed to fulfill a valid condition precedent imposed upon his receipt of the second installment of his 1988-89 bonus." 1991 U.S. Dist. LEXIS 4150, *22. Thus, it was the voluntary nature of Allison's walking away from his bonus that caused him to lose it.

By contrast, the defendant's executives in the Allison case testified that they would not ever withhold bonuses from employees whose employment ended for reasons beyond their control. 1991 U.S. Dist. LEXIS 4150, *14.

Again, this is a distinction that makes a difference. Where there is an agreement to pay a bonus, as a matter of fairness, equity and contract law, an employer's without cause termination of an employee cannot properly be allowed to frustrate the employee's fulfillment of any purported precondition to payment of the bonus and to cause the employee to forfeit the bonus.

### III.
### VETROMILE IS ENTITLED TO SEVERANCE

JPI is obligated to pay Vetromile severance according to its actual practices and policies with regard to severance payments, not according to the sheet which it has attached to its moving papers. It is well established that a company's obligations to pay severance may be established, not only by a written plan adopted pursuant to ERISA, but also may be established by the actual regular practice of the company with regard to the payment of severance. See, e.g., Giordano v. Thomson, 438 F.Supp.2d 35, 41 (E.D.N.Y. 2005) (employer's practice of awarding severance may establish enforceable ERISA plan); Bennett v. Gill & Duffus Chemicals Inc., 1987 W.L.

34256 (S.D.N.Y. 1987) (severance plan need not be in writing in order to be enforceable). JPI's actual practices and policies, as reflected in the offer made to Vetromile at the time of his termination (Exhibit 1 to the Shoemaker Affidavit) in Mr. O'Brien's testimony and in JPI's internal documentation, call for payment to Vetromile of severance in the amount of $35,828.31.

**IV.**
**PLAINTIFF'S CLAIMS FOR**
**QUANTUM MERUIT AND**
**UNJUST ENRICHMENT**
**SHOULD BE HELD IN ABEYANCE**

The claims for unjust enrichment and *quantum meruit* are alternative theories which are applicable only with respect to matters not covered by a contract claim. Those claims are irrelevant at this point because JPI does not deny the contract. The claims would, however, be valid if and to the extent that the contract did not apply because Mr. Vetromile clearly did originate the Maritime Yards transaction and reasonably expected to be compensated for it and for his other work in an amount above and beyond his base salary.

## CONCLUSION

The Court should grant summary judgment to Vetromile on all of his claims; JPI's motion for summary judgment should be denied.

Dated:    New York, New York
          March 30, 2009

                                        Respectfully submitted,

                                        **GREENFIELD STEIN & SENIOR, LLP**

                                        By: _Paul T. Shoemaker_
                                            Paul T. Shoemaker (PS-5388)
                                            600 Third Avenue - 11th Floor
                                            New York, New York 10016
                                            (212) 818-9600

                                        *Attorneys for Plaintiff Glen Vetromile*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- X

GLEN VETROMILE,

                                Plaintiff,

                     -against-

JPI PARTNERS, LLC,

                             Defendant.

------------------------------------------------------- X

  :   Index No. 07 Civ. 11032 (KMK) (GAY)

  :   **AFFIDAVIT OF SERVICE**
  :   **BY OVERNIGHT MAIL**

STATE OF NEW YORK    )
                         :    ss.:
COUNTY OF NEW YORK  )

           **JEAN OSTROW**, being duly sworn, deposes and says:

           1.     I am not a party to the within action, am over 18 years of age, and reside in Queens, New York.

           2.     On March 30, 2009, I served the within **PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTON FOR SUMMARY JUDGMENT** upon the following:

                  Neil Sparber, Esq.
                  FULBRIGHT & JAWORSKI L.L.P.
                  *Attorneys for Defendant*
                  666 Fifth Avenue
                  New York, NY 10103
                  *FEDERAL EXPRESS AIRBILL NO.: 7964 7407 4490*

by depositing a true copy thereof at Federal Express branch JRAI located at 600 Third Avenue,

New York, New York 10016 for overnight delivery.

_____
**JEAN OSTROW**

Sworn to before me this
30th day of March, 2009.

PAUL T. SHOEMAKER
Notary Public, State of New York
No. 4893282
Qualified in Westchester County
Commission Expires Sept. 30, 2009